**Opinion issued February 6, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-24-00644-CV**

———————————

**IN THE MATTER OF J.B.**

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-00912J**

---

## MEMORANDUM OPINION

This appeal arises out of a juvenile court's order waiving jurisdiction over the appellant and transferring his case to the criminal district court. Section 54.02(a) of the Texas Family Code authorizes a juvenile court to waive its exclusive original jurisdiction and transfer a juvenile to criminal district court under specified circumstances, including when the child is alleged to have committed a capital

felony, the child was 14 or older at the time, and "after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings." TEX. FAM. CODE § 54.02(a). This appeal concerns a transfer under that provision.

The appellant argues the evidence is insufficient to establish probable cause that he committed the capital murder alleged by the State. He also raises evidentiary issues and contends that the statutory requirements for the transfer are not satisfied.

We find no reversible error and affirm.

## BACKGROUND

The State alleged that the appellant, a juvenile who was 16 years old at the time of the conduct at issue, engaged in delinquent conduct by intentionally causing the death of another with a deadly weapon, a firearm, while committing or attempting to commit a robbery. The State's amended petition requested that the juvenile court transfer the appellant to the criminal district court.

After conducting a certification hearing, the juvenile court waived jurisdiction and transferred the case to criminal district court.

## I.    The Certification Hearing

The juvenile court held a certification hearing. *See id.* § 54.02(c), (e) (requiring juvenile court to hold non-jury hearing on petition to transfer, and specifying evidence juvenile court may consider, including reports and testimony). At this hearing, five witnesses testified, four for the State and one for the defense.

Before the hearing began, a lawyer for a sixth possible witness requested that this witness be excused. The witness was Gavin Paul, an adult who was previously criminally charged in connection with the victim's death. Counsel for the appellant subpoenaed Paul to testify as a witness at the certification hearing. Though the charge against Paul had since been dismissed, his lawyer represented that he intended to invoke his constitutional right against self-incrimination in response to any questions concerning the victim's death. Given Paul's intent to invoke his right against self-incrimination, the defense decided not to call him as a witness, explaining that it did not wish to "waste anybody's time." The juvenile court agreed that Paul had the right to not answer questions about his involvement and granted his lawyer's request that he be excused as a witness at the certification hearing.

### A.    The State's Evidence

#### 1.    Sergeant Duncan

The State's first witness was Sergeant C. Duncan of the Houston Police Department. He was the lead investigator concerning the homicide in question.

As Duncan testified, he arrived at the scene of the crime, a bus stop located at an intersection, several hours after the crime was reported. Upon arrival, he found the victim's body. The victim had a single gunshot wound in the center-left area of his back. The victim's pockets were turned inside out, and his shoes were missing.

A bullet casing lay nearby. This casing was consistent with the bullet later recovered from the victim's body—from his heart specifically—in an autopsy.

In the course of the investigation, Duncan learned the victim's identity. The medical examiner's office identified the victim as 27-year-old Dexter Watson. Additional investigation disclosed that Watson was employed by Wal-Mart and was using the bus system to return home after work.

Duncan testified that investigators obtained video surveillance footage from several sources, including buses and businesses surrounding the stop. They then put together a timeline of events.

None of the video footage captured the murder. But footage from around the time of the murder showed that three people followed Watson after he got off a bus. One of these three was on a bicycle and in the lead, while the other two followed the person on the bicycle. Duncan testified that the footage showed the person on the bicycle had a bulge in his back pocket that was consistent with a pistol—although Duncan could not be 100 percent certain that the bulge was a pistol.

When the investigators initially obtained and reviewed the video footage, they did not know the identity of the three people following Watson. Duncan stated that through further investigation, they identified the one on the bicycle as the appellant and identified the two others following on foot as Gavin Paul and Michael Ligon, Jr.

Initially, the investigators had no leads. Therefore, Duncan explained, the investigators asked the public for information via Crime Stoppers. It was an anonymous tip made to Crime Stoppers that led to the appellant's identification.

Duncan interviewed the appellant. But under an agreement between the parties, the State did not introduce any evidence about the appellant's interview.

Duncan also interviewed Paul on two separate occasions. During the first interview, Paul divulged that he was the person who made the anonymous tip to Crime Stoppers, a fact confirmed via cellular telephone data. Paul identified the bicycle rider as the appellant and himself and Ligon, Jr. as the other two. Duncan testified that Paul told him the appellant and Watson got into a verbal altercation, which resulted in the appellant pistol-whipping and then shooting Watson. Paul claimed he saw the pistol-whipping but only heard the subsequent shooting. Paul told Duncan that he did not see the appellant with a firearm before the shooting.

Duncan characterized Paul as cooperative and as seeming to have a guilty conscience. In addition to confirming that Paul had contacted Crime Stoppers, his cellular telephone data also indicated that he had conducted internet searches the day

beforehand to ascertain how long someone could go to jail for shooting another person as well as how long one could be jailed for not reporting such a shooting.

Prompted in part by the further investigation, Duncan later interviewed Paul a second time. During the second interview, Paul changed his story, telling Duncan that the motivation for the crime had been robbery, not a verbal altercation. According to Paul, when Watson got off the bus, the appellant proposed to Paul and Ligon, Jr. that they rob Watson. The appellant then began pursuing Watson to do so.

Paul again told Duncan that the appellant pistol-whipped Watson. Then, while Watson lay unconscious on his stomach, the appellant shot him. Afterward, the appellant took Watson's backpack, cellular phone, and headphones off his body.

Duncan stated the investigators tested for DNA under Watson's fingernails and on his body and clothing, particularly his pockets, which were found turned inside out. Testing revealed the appellant's DNA in one of Watson's back pockets and Ligon, Jr.'s in a front one. Paul's DNA was absent.

As Duncan explained, the appellant was not the only person who took items from Watson's body. Video footage showed that, at a later point in time, someone took Watson's shoes.

Duncan testified that the investigators obtained social media posts and messages from accounts held by the appellant, Paul, and Ligon, Jr. near the time of the murder. In messages between the appellant and a man named Victor Miller, the

6

appellant told Miller that he "took a n[***]a down bad" in response to Miller's inquiry as to what had happened. Before a grand jury, Miller explained that taking another person down bad meant either robbing or taking advantage of that person.

In another message, this one from Ligon, Jr. to Paul, Ligon, Jr. stated: "Aye [the appellant] said he shot him and I was there." Ligon, Jr. then agreed that he was there, writing "all my people know I told them I was there I ain't say yo name."

Duncan also interviewed a woman by the name of Kayla Taunton, who had come into possession of Watson's cellular telephone. Taunton claimed she had bought it from another, unidentified woman at a gas station near the bus stop. Taunton said this unidentified woman had an Apple iWatch for sale as well. Duncan learned from Watson's mother that he had such a watch, which was missing. Based on the surveillance footage and Taunton's description of this woman, Duncan believed the woman is an associate of the appellant because a woman matching the description Taunton gave can be seen with the appellant before the shooting.

### 2. Probation Officer Longoria

The State's second witness was R. Longoria, who is a juvenile probation court officer. Longoria monitors the appellant's behavior in detention.

Longoria met with the appellant once per week and reviewed his incident reports, which she described as documents detailing his violations of the rules.

7

The incident reports were admitted into evidence. One report documents that the appellant threatened a staff member. This incident resulted in the placement of the appellant in safety-based seclusion for some time. While the appellant was in seclusion, he was interviewed about the incident. During this interview, the appellant stated he was going to "slap the shit" out of this staff member given the chance.

Another report notes the appellant was again placed in seclusion, this time for disobedience. Specifically, the appellant refused to return to his room at bedtime.

A third incident report records that during an altercation between the appellant and another, the appellant tried to spit at him but hit a staff member instead. This incident also resulted in the placement of the appellant in seclusion. When interviewed about the incident, the appellant angrily responded with profanities.

A fourth report concerned a "shank"—a makeshift knife or weapon meant for stabbing or slashing—or the makings of one that staff found in the appellant's pillowcase during a search of his room. Longoria testified that in her 25 years as a juvenile probation court officer, she had never seen a shank in juvenile detention.

During a period of about six months, the appellant had 22 rule violations. Ten of these violations were for aggressive, threatening, or assaultive behavior.

On cross-examination, Longoria agreed that the appellant had not had any violations within the preceding month and half or so before the certification hearing.

### 3. Dr. Smith

The State next called Dr. Christin Smith. Smith is a clinical psychologist who evaluates juveniles at the juvenile detention center, including for the purpose of deciding whether they should be transferred to a criminal court. Smith authored a written report, which was admitted into evidence.

As the record shows, Smith interviewed the appellant. The appellant was generally cooperative and willingly participated in the evaluation—although he and another juvenile in the same area got into a verbal altercation that threatened to become physical before a staff member got involved.

During the interview, Smith asked the appellant if he had ever possessed a weapon, and the appellant denied possessing one. Smith noted that discovery materials in this case include Instagram photographs of the appellant with a gun.

Smith also interviewed the appellant's uncle, Marcus Ligon, Sr., who is the appellant's guardian. Ligon, Sr. described the appellant as having a low tolerance for frustration, which may result in the appellant becoming angry or aggressive quickly. According to the evidence, the appellant has anger issues stemming from the death of his mother.

Smith reviewed the incident reports from the appellant's time in detention as well as his therapy records. She noted that staff sometimes extended the appellant's period of safety-based seclusion due his lingering anger after an incident.

9

In terms of her own evaluation of the appellant, Smith conducted a personality assessment and rated the appellant as moderately low on warmth, which indicates that he is not very warm and does not value close relationships with others. Smith also rated the appellant as slightly elevated in terms of treatment rejection, which indicates he has a higher chance of rejecting treatment than the average juvenile.

In evaluating the appellant, Smith used the Risk-Sophistication-Treatment Inventory, which is a semi-structured interview and rating scale that helps clinicians assess a juvenile's dangerousness, sophistication, maturity, and amenability to treatment. But as indicated in her written report, Smith's conclusions were not confined to or exclusively based on the Risk-Sophistication-Treatment Inventory.

Regarding the appellant's sophistication and maturity, Smith testified it is in the middle range. That is, the appellant is comparable to other juveniles in the detention system. This is true whether or not the murder is taken into account.

Excluding the alleged murder of Watson, Smith rated the appellant's criminal sophistication as average. If one includes the murder in the evaluation, however, Smith opined that this elevates his criminal sophistication above average, in part because the appellant allegedly hid evidence of the crime, disposing of the pistol.

According to Smith, the appellant is not manipulative in the sense of trying to get others to do what he wants through deception. Rather, he is more impulsive. When he chooses to do something, the appellant does not consider the consequences.

That said, Smith noted that his alleged participation in the crime, if true, suggested that the appellant spent a long period of time looking for a vulnerable person to target.

As to the appellant's lack of empathy, Smith testified that the appellant more than once indicated in response to hypothetical questions about crime victims that their misfortune is not his problem. As Smith noted in her report, the appellant indicated that crime is a means to an end for which no empathy is due. Based on these questions and answers, Smith rated the appellant's dangerousness as being in the high range and his amenability to treatment as below average for a juvenile.

According to Smith, the appellant's dangerousness is above average even if one excludes the alleged murder from consideration. If one takes the alleged murder into account, Smith testified, the appellant's dangerousness is in the high range. She noted that the high range generally is the top of the scale in terms of dangerousness. With respect to the appellant's dangerousness, Smith was particularly concerned by his egocentricity, quick temper, lack of empathy, and delinquent peer group.

With or without taking into account the alleged murder, the appellant's amenability to treatment is below average, Smith testified, meaning that there is a slightly lower chance of successfully rehabilitating him compared to other juvenile offenders. In her report, Smith noted that the appellant on one occasion stated he

11

would not undergo therapy or treatment again because he is too old for them. He also was dismissive of the notion that he has problems requiring treatment.

Overall, Smith testified that the appellant poses a moderate risk of committing another violent offense, if the alleged murder is discounted. If the murder included in the evaluation, then his risk of violently reoffending is moderately high.

On cross-examination, Smith agreed that the appellant's full-scale IQ is 65, which is extremely low. She also agreed that the Wide Range Achievement Test reflected that the appellant's spelling and math skills are at a second-grade level. Nonetheless, Smith observed, he was found to be competent for this proceeding.

Smith also acknowledged that in addition to his borderline intellectual functioning, the appellant exhibits symptoms of prolonged grief disorder relating to the death of his mother when he was in the fifth grade. Smith agreed that the appellant has not received the type of counseling he needs for these symptoms.

Smith reported the appellant as having oppositional defiant disorder.

Smith agreed that the juvenile justice system has programs that focus on rehabilitating offenders, and she agreed they would be beneficial to the appellant. In contrast, Smith did not know what programs would be available in the adult system.

### 4. Ms. Watson

Finally, the State called Sharon Watson, the mother of the murder victim. She testified about her son and the circumstances under which she learned of his death.

12

**B.    The Defense's Evidence**

The defense called its sole witness, Chuck Marler. Marler is a private investigator employed by the defense. He testified that he reviewed the video surveillance collected by law enforcement and found it to be of low quality. He indicated that no one could identify the people on it as result.

Marler also reviewed the social-media-related materials produced in discovery. He noted that there are photographs in which Paul exhibited firearms.

Based on his evaluation of Paul's interviews by detectives, Marler found Paul to be a reluctant and inconsistent witness. Marler indicated that he believed Paul was more involved in the crime than he admitted during the two interviews he gave.

Marler testified that the sole evidence he was aware of implicating the appellant in the murder of Watson consisted of Paul's statements to the detectives. But on cross-examination, Marler conceded that he had seen the DNA report in this case and that it showed the appellant's DNA was found on Watson's pocket.

## II.    Juvenile Court's Findings

After hearing the evidence, the juvenile court found there is probable cause to believe the appellant committed the offense of capital murder. In addition, taking into consideration the factors set forth in section 54.02(f) of the Texas Family Code, the juvenile court waived its exclusive original jurisdiction and transferred the appellant to the criminal district court to be tried as an adult for the offense.

In the juvenile court's written order waiving its exclusive original jurisdiction, the court noted in particular that the welfare of the community required transfer for criminal proceedings for the following reasons: the seriousness of the crime and the appellant's conduct while committing it, and the background of the appellant.

**DISCUSSION**

Juveniles are not ordinarily subject to criminal proceedings. *In re S.G.R.*, 496 S.W.3d 235, 238 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Instead, juvenile courts have exclusive original jurisdiction over cases involving offenses committed by those who are between 10 and 17 years of age. TEX. FAM. CODE §§ 51.02(2)(A), 51.03(a)(1), 51.04(a). But in some cases, a juvenile court may waive its jurisdiction and transfer a juvenile to the criminal district court for criminal proceedings.

As relevant here, a juvenile court may waive its exclusive original jurisdiction if a juvenile is 14 years old or older and is alleged to have committed a capital felony, provided that the juvenile court determines after investigation and hearing that there is probable cause to believe the juvenile committed the alleged offense and the welfare of the community requires criminal proceedings given the seriousness of the offense or the juvenile's background. *Id.* § 54.02(a)(1), (a)(2)(A), (a)(3).

When the State petitions the juvenile court to waive its exclusive original jurisdiction, the court must conduct a non-jury hearing to consider transfer of the

14

juvenile to the criminal district court for criminal proceedings. *Id.* § 54.02(b), (c). The juvenile court may consider testimony as well as written reports. *Id.* § 54.02(e).

In deciding whether to waive its exclusive original jurisdiction, the juvenile court must consider whether the offense was against person or property, giving greater weight to transfer to offenses against the person; the juvenile's sophistication and maturity; the juvenile's record and previous history; and the prospects of adequate protection of the public and rehabilitation of the juvenile via the procedures, services, and facilities available to the juvenile court. *Id.* § 54.02(f). While the juvenile court must consider these factors, they are non-exclusive. *Id.*

On appeal here, the appellant raises three issues. First, he argues that there is insufficient evidence to support the probable-cause finding that he committed the crime. Second, he raises evidentiary issues. And third, he argues that the trial court erred in its application of the statutory requirements. We disagree and affirm.

## I.    Standard of Review

We review a juvenile court's fact findings in support of a transfer decision under traditional evidentiary sufficiency principles. *In re H.Y.*, 512 S.W.3d 467, 478–79 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). In a legal-sufficiency review, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable factfinder could not do so. *In re J.W.W.*, 507 S.W.3d 408, 413 (Tex. App.—Houston [1st Dist.] 2016, no pet.). If more than a

scintilla of evidence supports a finding, the evidence is legally sufficient. *Id.* In a factual-sufficiency review, we consider all the evidence to determine whether the juvenile court's findings are so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

Because the juvenile court sits as factfinder and evaluates the witnesses in person, it is the sole judge of their credibility. *In re T.S.*, 548 S.W.3d 711, 728 (Tex. App.—Houston [1st Dist.] 2018, no pet.). The juvenile court can choose to believe or disbelieve a witness in whole or part, including an expert witness's testimony. *In re S.G.R.*, 496 S.W.3d at 241. As factfinder, the juvenile court weighs the evidence and resolves any inconsistencies. *In re T.S.*, 548 S.W.3d at 730.

If the evidence is legally and factually sufficient to support the juvenile court's findings, we review its ultimate waiver decision for abuse of discretion. *See id.* at 722, 731. The question is not whether we would have decided differently. *See id.* at 721–22. Instead, we consider whether the juvenile court's waiver was arbitrary or made without reference to the statutory criteria. *See id.* at 722, 731. If it correctly applies these criteria and states its reasons for transfer, its waiver decision generally will satisfy our review for abuse of discretion. *See id.* at 722.

## II.     Probable-Cause Finding

First, the appellant argues the evidence is legally and factually insufficient to establish probable cause that he committed the capital murder alleged by the State.

In particular, the appellant maintains there is insufficient evidence that he shot Watson. The appellant emphasizes that no video surveillance places him at the murder scene and the State has not located the pistol used to kill Watson. He also asserts that key evidence implicating him, Paul's accomplice testimony, is inconsistent and inadequate to establish probable cause.

Applying the controlling standard of review to this record, we disagree.

## A.      Applicable Law

In reviewing a probable-cause finding for legal and factual sufficiency, we consider whether there are sufficient facts and circumstances to support a prudent person's belief that the juvenile committed the alleged offense. *In re C.M.*, 571 S.W.3d 849, 858 (Tex. App.—Houston [1st Dist.] 2018, no pet.). We consider the totality of the circumstances when reviewing a probable-cause finding. *Id.*

The appellant is charged with capital murder. As relevant here, a person commits murder if he intentionally or knowingly causes the death of another. TEX. PENAL CODE § 19.02(b)(1). Murder becomes capital murder if, among other things, the person intentionally commits the murder in the course of committing or attempting to commit the offense of robbery. *Id.* § 19.03(a)(2). A person commits the offense of robbery, in turn, if while committing theft with the intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly injures

17

another. *Id.* § 29.02(a)(1). The offense of theft is the unlawful appropriation of property with the intent to deprive the owner of the property. *Id.* § 31.03(a).

### B.    Analysis

The question before us on appeal is whether the State put on enough evidence to allow a prudent person to believe that the appellant did in fact rob and murder Watson. The answer is yes. We offer no opinion on the evidence beyond concluding that the finding of probable cause for these purposes is supported; the question before us does not determine guilt or innocence. *See In re C.R.*, 571 S.W.3d 849, 859 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Though the appellant says that no video surveillance footage places him at the murder scene, footage does place him its immediate vicinity. Indeed, footage shows him trailing behind Watson on a bicycle after Watson disembarked from a bus.

More significantly, DNA evidence places the appellant at the murder scene. DNA taken from one of Watson's pockets matches the appellant's DNA.

Moreover, although the appellant is correct that law-enforcement authorities have not found the pistol used to murder Watson, Sergeant Duncan noted that the video footage showed a bulge in the appellant's back pocket that was consistent with a pistol.

The appellant is also correct that Paul's version of events, as relayed by Duncan in his testimony about his interviews with Paul, is damning. Paul told Duncan that the appellant proposed to rob Watson, did so, and shot him.

The appellant argues we should discount Paul's statements because his story changed and, as an accomplice who could be recharged, he is biased and unreliable. But the resolution of evidentiary inconsistencies, as well as credibility questions, are entrusted to the juvenile court. *In re S.G.R.*, 496 S.W.3d at 241; *In re T.S.*, 548 S.W.3d at 730.

In any event, Paul's word is not the lone support for the final version of events he relayed to Duncan. In an exchange of Instagram messages, the appellant told another that he "took a n[***]a down bad." The recipient of this message later told a grand jury that this meant the appellant robbed or took advantage of someone.

Similarly, in a set of Instagram messages between Ligon, Jr. and Paul, the former wrote: "Aye [the appellant] said he shot him and I was there." Ligon, Jr. continued "all my people know I told them I was there I ain't say yo name."

Finally, a woman matching the description of a woman who was seen on video with the appellant later sold Watson's stolen cellular telephone.

Given the totality of the evidence, a prudent person could form a reasonable belief that the appellant robbed and murdered Watson. The evidence is legally and factually sufficient to support the juvenile court's probable-cause finding.

19

**III.    Evidentiary Issues**

The appellant next raises two evidentiary arguments. First, he argues the juvenile court erred in considering evidence obtained by law-enforcement authorities through Paul because he is an accomplice who was not questioned at the certification hearing due to his invocation of his constitutional right not to incriminate himself. Second, the appellant argues that, if the juvenile court was going to consider evidence derived from Paul's statements to law-enforcement authorities, the court was obliged to consider additional evidence that it excluded, specifically, that Paul was a drug dealer with access to firearms.

Neither has merit. Our Court has previously rejected the premise underlying his first argument, and both arguments fail on this record and under controlling law.

**A.    Evidence Derived from Paul**

In support of his contention that the juvenile court should not have considered any evidence derived from Paul, the appellant relies on article 38.14 of the Texas Code of Criminal Procedure, which generally provides that a conviction cannot rest on the uncorroborated testimony of an accomplice. TEX. CODE CRIM. PROC. art. 38.14; *see also* TEX. FAM. CODE § 54.03(e) (similarly providing that juvenile cannot be adjudicated delinquent based on uncorroborated accomplice testimony).

However, our court has already addressed and rejected the contention that article 38.14 requires a juvenile court to exclude or discount uncorroborated

20

accomplice testimony in a certification hearing—as opposed to a trial on the merits. *In re C.R.*, 571 S.W.3d at 858–59. As we have explained, the objective of a certification hearing is limited to deciding if there is probable cause to believe the juvenile committed the offense. *Id.* at 859. The hearing does not decide guilt or innocence; it decides whether the juvenile should be tried in criminal court. *See id.* (explaining that appellant had "presented no authority that the juvenile court is prohibited from considering evidence obtained from an accomplice in the context of a transfer decision").

That Paul did not testify at the certification hearing does not alter the outcome. Hearsay is admissible in certification hearings. *E.g.*, *In re A.W.*, 661 S.W.3d 547, 553–54 (Tex. App.—Houston [14th Dist.] 2023, pet. denied). The uncorroborated statements of an accomplice admitted through the testimony of a detective, like Sergeant Duncan, likewise are admissible in this context. *See, e.g.*, *In re C.R.*, 571 S.W.3d at 853–59 (rejecting challenge to accomplice statements admitted through detective).

In any event, as we explained in our discussion of probable cause, Paul's testimony that the appellant robbed and murdered Watson is not uncorroborated. DNA evidence places the appellant at the murder scene. Ligon, Jr., the third person who followed Watson after Watson got off the bus, wrote a text message stating that the appellant had acknowledged shooting Watson. The record makes clear that the

21

statements Paul made to Sergeant Duncan are not the only evidence connecting the appellant to this crime.

## B.  Excluded Evidence

As to the appellant's complaint that the juvenile court erred in excluding evidence that Paul is a drug dealer and has access to weapons, we note that while the court sustained the State's objection to this evidence during Sergeant Duncan's testimony, Marler later testified without objection that he saw photographs of Paul with firearms. Thus, proof of Paul's access to firearms made its way into evidence. That renders its exclusion elsewhere harmless, even assuming its exclusion was erroneous. *See, e.g.*, *Montgomery v. State*, 383 S.W.3d 722, 727 (Tex. App.— Houston [14th Dist.] 2012, no pet.) (holding evidence initially excluded but subsequently admitted rendered harmless any possible error as to its exclusion).

Moreover, the juvenile court did not abuse its discretion in excluding evidence ostensibly showing that Paul is a drug dealer. At the certification hearing, the appellant argued this evidence is admissible because it tends to show Paul is the robber and murderer, not the appellant, but the juvenile court sustained the State's relevance objection. Given that there is no evidence that the robbery and murder of Watson was drug-related, the juvenile court did not err in deciding Paul's alleged status as a drug dealer does not have any tendency to make it more probable that Paul, rather than the appellant, robbed and murdered Watson. *See* TEX. R. EVID. 401

22

(evidence is relevant if it tends to make a fact of consequence more or less probable than it otherwise would be without the evidence).

## IV. Section 54.02(f) Factors

Finally, the appellant argues the juvenile court abused its discretion in finding that the welfare of the community warranted his transfer for criminal proceedings because other evidence in the record shows waiver of jurisdiction is inappropriate. In essence, the appellant posits that when all the concerns embodied by the factors set forth in section 54.02(f) of the Texas Family Code are considered, the balance weighs in favor of the retention of jurisdiction by the juvenile court, not waiver. Not so.

### A. Applicable Law

Section 54.02(f) states the following:

In making the determination required by Subsection (a) of this section, the court shall consider, among other matters:

(1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2) the sophistication and maturity of the child;

(3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

TEX. FAM. CODE § 54.02(f).

Not all four factors set forth in section 54.02(f) need to weigh in favor of transfer to justify a juvenile court's waiver of its jurisdiction. *In re S.G.R.*, 496 S.W.3d at 238. In general, any combination of them may justify the waiver of juvenile jurisdiction. *Id.* In reviewing the sufficiency of the evidence underlying the juvenile court's decision, we must bear in mind that the juvenile court need not exhaustively catalogue the supporting evidence. *Id.* at 241.

## B. Analysis

In its written order, the juvenile court stated that it considered each of the four factors listed in section 52.04(f), and it emphasized two in particular as the basis for its decision. First, the juvenile court found that the welfare of the community required transfer for criminal proceedings due to the seriousness of the alleged crime and the appellant's alleged conduct during its commission. Second, the court found the welfare of the community required transfer due to the appellant's background.

The record amply supports the juvenile court's findings.

With respect to the seriousness of the crime and the circumstances surrounding its commission, the alleged crime is capital murder arising out of a robbery and shooting. This a serious crime against a person resulting in a fatality. But it is not merely the category of crime, capital murder, or its consequence, death of a young person, that are serious. The circumstances of the crime are significant as well. The trial court heard evidence that Watson was pistol-whipped and then shot

24

in the back while he lay prone and helpless. This is a gratuitous crime exhibiting malice and callous disregard for human life, which supports the juvenile court's decision. *See In re S.G.R.*, 496 S.W.3d at 243 (indicating that when the crime is sufficiently brutal and malevolent, the nature of the crime alone may support the waiver of juvenile jurisdiction by the court).

As to the appellant's background, the evidence of his conduct while in the juvenile detention center is particularly salient because it is a controlled environment in which the appellant was under direct observation. During a roughly six-month period, the appellant had 22 rule violations, 10 of which were for aggressive, threatening, or assaultive behavior. Notably, one violation was for creating a makeshift knife, something Longoria, his juvenile probation court officer, testified she had not seen another juvenile do during her 25 years of service in this profession. The juvenile court was entitled to give significant weight to these rule violations in assessing whether the appellant ought to remain in the juvenile justice system. *See In re K.J.*, 493 S.W.3d 140, 152–53 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (agreeing that violations of rules while in detention center, which included violations involving violence, supported juvenile court's decision to waive its jurisdiction).

The appellant emphasizes that he had no rule violations during the month-and-a-half or so before the certification hearing. However, the juvenile court was not

obliged to give more weight to the appellant's more recent, short-term improvement in behavior than to his lengthier period of serious misbehavior while in detention.

In addition, when the appellant was evaluated by Dr. Smith, she found that he was indifferent to the impact of crime on its victims. As she testified, the appellant viewed crime as a means to an end, and the consequences visited on others were of no concern to him. The juvenile court was the judge of credibility of the evidence.

The appellant argues the juvenile court should have given greater weight to the programs for rehabilitation that exist in the juvenile justice system. But the juvenile court could have reasonably concluded that the appellant's hardened attitudes about crime made him an unlikely candidate for rehabilitation. Notably, Dr. Smith testified that his amenability to treatment is below average for a juvenile.

Given the record and the juvenile court's consideration of the factors set forth in section 54.02(f) of the Texas Family Code, the juvenile court's decision to waive its jurisdiction was not arbitrary or unprincipled. *See In re S.G.R.*, 496 S.W.3d at 243 (concluding that the nature of the crime and other circumstances relating to section 54.02(f)'s factors invoked by juvenile court showed its decision was not capricious). Accordingly, the juvenile court did not abuse its discretion by doing so. *Id.*

# CONCLUSION

We affirm.

Jennifer Caughey
Justice

Panel consists of Justices Guerra, Caughey, and Morgan.